

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

THE ESTATE OF VILMA SOLTESZ, by administrator
JANOS SOLTESZ, and JANOS SOLTESZ, individually,

                                  Plaintiffs,

      -against-

DELTA AIR LINES, INC., KONINKLIJKE
LUCHTVAART MAATSCHAPPIJ N.V. d/b/a
KLM ROYAL DUTCH AIRLINES and DEUTSCHE
LUFTHANSA AKTIENGESELLSCHAFT,

                                Defendants.
----------------------------------------------------------------x

CASE NO.

**COMPLAINT AND JURY DEMAND**

      Plaintiff, JANOS SOLTESZ, by his attorneys, RONAI & RONAI, L.L.P., as and for his Complaint, respectfully alleges, upon information and belief:

## I. <u>NATURE OF THE CASE</u>

      1. This is an action for the conscious pain, suffering and wrongful death of decedent Vilma Soltesz, and damages sustained by plaintiff JANOS SOLTESZ, as a result of the recklessness, carelessness, negligence and/or other wrongful acts and/or omissions of the defendants herein, from July 17, 2012, to October 24, 2012.

## II. <u>JURISDICTION AND VENUE</u>

      2. Jurisdiction over this claim and the defendants herein, exists pursuant to 28 USC Section 1331 under a treaty of the United States of America, the Convention for the Unification of Certain Rules for International Carriage by Air, signed in Montreal Canada, on May 28, 1999, which is more commonly known as the "Montreal Convention."

3. Jurisdiction over this claim further exists pursuant to 28 U.S.C. §1332, as there is complete diversity of citizenship between the parties and the amount in controversy herein exceeds $75,000.00, exclusive of costs.

4. Venue lies in the Southern District of New York in that plaintiff JANOS SOLTESZ resides within the Southern District of New York, and that a substantial portion of the relevant events occurred, transpired, and/or originated within the Southern District of New York.

### III. THE PARTIES

5. Plaintiff JANOS SOLTESZ was and still is a resident of the County of Bronx, State of New York. [At times referred to herein as "JANOS"]

6. Vilma Soltesz, plaintiff's decedent, was a resident of the County of Bronx, State of New York, at the time of her death. [Hereinafter referred to as "Vilma"]

7. At all times mentioned herein, Plaintiff JANOS SOLTESZ, was the legal spouse of decedent Vilma Soltesz, and brings this action as the representative of Vilma Soltesz, and in his own regard.

8. The defendant DELTA AIR LINES, INC, was and still is a foreign corporation, created, organized and existing under and by virtue of the laws of Delaware, licensed to do business in the State of New York. [Hereinafter referred to as "DELTA"]

9. At all times mentioned herein, the defendant DELTA, acted by and through its respective agents, servants, workmen and employees acting within the scope of their authority and employment.

10. The defendant KONINKLIJKE LUCHTVAART MAATSCHAPPIJ N.V. d/b/a KLM ROYAL DUTCH AIRLINES was and still is a foreign corporation, created, organized and

existing under and by virtue of the laws of Netherlands Antilles, licensed to do business in the State of New York. [Hereinafter referred to as "KLM"]

11. At all times mentioned herein, defendant KLM, acted by and through its respective agents, servants, workmen and employees acting within the scope of their authority and employment.

12. The defendant DEUTSCHE LUFTHANSA AKTIENGESELLSCHAFT, was and still is a foreign corporation, created, organized and existing under and by virtue of the laws of Germany, licensed to do business in the State of New York. [Hereinafter referred to as "LUFTHANSA"]

13. At all times mentioned herein, the defendant LUFTHANSA, acted by and through its respective agents, servants, workmen and employees acting within the scope of their authority and employment.

## IV. <u>FACTUAL ALLEGATIONS</u>

14. At all times herein mentioned, Vilma Soltesz had a partially amputated leg which caused her to be immobile and wheelchair bound.   She further suffered from other health issues, including morbid obesity.

15. At all times herein mentioned, JANOS SOLTESZ, was Vilma's primary caregiver.

16. On or about July 17, 2012, JANOS and Vilma's travel agent booked roundtrip flights for them in economy class between JFK Airport, New York, and Budapest Ferihegy International Airport, Hungary, connecting Amsterdam. Due to Vilma's medical condition and weight, two seats were purchased for Vilma and one for JANOS, for all of their flights. They were to depart on September 17, 2012, from JFK Airport and return on October 16, 2012, to JFK Airport.

3

17. The said flights were all KLM operated flights, but booked and purchased through DELTA.

18. At all times herein mentioned, DELTA and KLM were operating through, by and pursuant to a "codeshare" agreement and/or partnership.

19. At the time of booking the said flights, the travel agent advised DELTA/KLM of Vilma's medical conditions, her weight, and her need for special assistance in boarding and disembarking.

20. On July 18, 2012, having full knowledge of Vilma's medical condition, weight, and special needs, DELTA/KLM issued three roundtrip tickets to Vilma and JANOS.

21. Upon arrival at JFK Airport, on September 17, 2012, JANOS and Vilma checked in for their flights at the DELTA ticket counter. At that time, JANOS again advised the DELTA ticket agent of Vilma's medical condition and weight, so that the necessary and proper accommodations could be made for Vilma's departure and return flight home. The DELTA ticket agent advised JANOS that the airline was well aware of same. They were then issued DELTA boarding passes for KLM flight KL642, from New York to Amsterdam, and KLM boarding passes for KLM flight 1975, Amsterdam to Budapest.

22. JANOS and Vilma departed from JFK International Airport on KLM's flight KL642 and arrived in Schiphol Amsterdam Airport, Amsterdam on September 18, 2012, without incident. JANOS and Vilma then took their connecting flight, KL1975 to Budapest, again without incident.

23. Upon disembarking the flight at Budapest Ferihegy International Airport, a KLM representative asked JANOS to meet with them in their "departure office." At said meeting, KLM employees asked JANOS when he and Vilma would be returning to New York, so that they could be sure to have the proper equipment available and make the necessary accommodations for

4

that date.   JANOS advised them that he and Vilma would be departing Budapest on October 15, 2012, on flight KL1976.   He then thanked them for their help and left the airport with Vilma.

24. On or about October 2, 2012, VILMA began feeling ill and sought treatment at Veszprem Hospital in Hungary.   She was released and told that she could fly home, but to see her own doctor immediately upon arrival in New York.

25. Prior to returning to the United States JANOS and VILMA spoke to VILMA's treating doctor in New York doctor. He told her to come in to see him immediately upon returning to New York so that he could examine her and then either adjust her medication or prescribe new medication.

26. On October 15, 2012, JANOS and Vilma arrived at Budapest Ferihegy International Airport. They were scheduled to return home to New York that day, connecting through Amsterdam. JANOS and Vilma checked in for their flights at the KLM ticket counter.   At that time, JANOS reminded the KLM ticket agent of Vilma's medical condition, her weight and her need for special assistance/accommodations. The KLM ticket agent told JANOS that they were well aware of same. JANOS and Vilma were then issued KLM boarding passes for flight KL1976 from Budapest to Amsterdam, and flight KL643 from Amsterdam to New York.

27.   Once JANOS and Vilma were onboard the aircraft, it was discovered that the backs of two seats in their row were broken.   As such, Vilma was unable to maneuver from her wheelchair into her assigned seats.   When informed of the problem, the KLM employees did not offer to change Vilma's seats, but rather, they went to speak to the captain of the flight.   Thereafter, the captain came out of the cockpit and informed JANOS and Vilma that they would have to disembark from the flight immediately.

28. Upon disembarking from the flight, JANOS and Vilma were told by KLM employees to wait at the airport terminal while they tried to make "other arrangements" for them.

29. After waiting in the Budapest Ferihegy International Airport for over <u>five hours,</u> KLM employees finally advised JANOS and Vilma that they had made arrangements for them to take a DELTA flight the following day from Vaclav Havel International Airport in Prague, Czechoslovakia, directly to JFK airport.   At that time, the KLM employees *assured* JANOS and Vilma that DELTA had been made aware of Vilma's medical condition and her weight, and that there would be no further issues accommodating her for their return flight home.

30. JANOS and VILMA drove four and one half (4 ½) hours through the night from Budapest, Hungary to Prague, Czechoslovakia.

31. Upon arrival at Vaclav Havel Airport in Prague at approximately 5:00 a.m. on October 16, 2012, JANOS and VILMA checked in for their flight at the DELTA ticket counter.   At that time, JANOS and VILMA confirmed with the DELTA ticket agent that DELTA was aware of Vilma's medical condition and weight, and that the necessary accommodations had been made. They were then issued DELTA boarding passes for flight DL211, which was scheduled to leave at 1:25 p.m.

32. Upon attempting to board the aircraft, however, it became apparent that DELTA did not have an adequate or proper wheelchair to transport Vilma to her seat.   As such, VILMA and JANOS were forced to disembark.

33. Upon inquiry by JANOS, the DELTA flight coordinator told JANOS and Vilma that DELTA "did not have access to a skylift" to get VILMA onto the aircraft from the rear, and that there was nothing more DELTA could do for them.

34. DELTA made no further travel arrangements for JANOS and Vilma and so they drove back to their vacation home in Veszprem, Hungary.

35. Upon returning to their vacation home in Veszprem, Hungary, JANOS and Vilma contacted their travel agent in New York and advised her of what had occurred. The travel agent subsequently made reservations for JANOS and Vilma to return to New York on October 22, 2012, on LUFTHANSA flight LH1335 from Budapest to Frankfurt, Germany, and then connecting on LUFTHANSA flight LH404, to New York.

36. At the time of booking said flights, the travel agent notified LUFTHANSA of VILMA's medical condition and weight, so that the necessary and proper accommodations could be made for her departure on October 22, 2012. Tickets for three economy seats were then issued by LUFTHANSA to JANOS and Vilma.

37. On October 22, 2012, JANOS and Vilma arrived at Budapest Ferihegy International Airport and proceeded to the LUFTHANSA ticket counter to check in for their flights. At that time, JANOS and Vilma confirmed with the LUFTHANSA ticket agent that the airline was aware of Vilma's medical condition and weight, and that the proper arrangements had been made to get her safely onboard the aircraft. JANOS and VILMA were then issued LUFTHANSA boarding passes for all legs of their journey.

38. Thereafter, several LUFTHANSA medics and local EMS/Firefighters helped to get Vilma onto the aircraft and into the row of her assigned seats. However, with the boarding of Vilma onto flight LH1335 almost complete, the captain came out of the cockpit and told JANOS and Vilma that they would have to disembark immediately. He stated that "other passengers need to catch a connecting flight and cannot be delayed further."

39. The disembarking of Vilma from the aircraft took approximately 25-30 minutes.

7

40. With nowhere else to turn, JANOS and Vilma drove back their vacation home in Veszprem, Hungary. Vilma was extremely exhausted and feeling ill during the trip home. She told JANOS that she just needed to sleep.

41. Upon arriving at their vacation home in Veszprem, Hungary, Vilma went right to bed and JANOS contacted their travel agent in New York once again to tell her what had transpired. The travel agent assured JANOS that she would somehow find a way for them to get home to New York soon.

42. On October 24, 2012, JANOS found Vilma dead in her bed.

## VI. COUNT I

### *Recklessness, Carelessness, Negligence and/or Other Wrongful Acts and/or Omissions*

43. Plaintiff incorporates herein by reference all prior paragraphs of this Complaint as if fully set forth herein.

44. The events as set forth herein, occurred on aircrafts and/or in course of the operations of embarking/disembarking from aircrafts, as provided by Article 17 of the Montreal Convention.

45. The events as set forth herein constituted unexpected and unusual events that were external to plaintiff's decedent, Vilma Soltesz, as a passenger, and thus, qualifies as an "accident" under Article 17 of the Montreal Convention.

46. Due to the recklessness, carelessness, negligence or other wrongful acts and/or omissions of the defendants, plaintiff's decedent, Vilma Soltesz, suffered severe bodily injuries and/or the exacerbation of certain medical conditions, which resulted in her death.

47. The limitations on recoverable damages contained in Article 22 of the Montreal Convention do not apply herein as the said bodily injuries and/or the exacerbation of certain

8

medical conditions and the death of the plaintiff's decedent, Vilma Soltesz, were the proximate result of the recklessness, carelessness, negligence or other wrongful acts and/or omissions of the defendants.

## VII. COUNT II

### Gross Negligence & Recklessness/Outrageous Conduct

48. Plaintiff incorporates herein by reference all prior paragraphs of this Complaint as if fully set forth herein.

49. Despite the fact that defendants were previously advised of Vilma Soltesz's medical condition and weight, that they accepted same and issued tickets to her, they willfully and intentionally refused to embark her and/or forcibly disembarked her from the aircrafts.

50. Despite the fact that defendants were previously advised of Vilma Soltesz's medical condition and weight, that they accepted same and issued tickets to her, they willfully and intentionally refused to make the proper accommodations for her and effectively sent her on a debilitating "*wild goose chase*" from airline to airline, airport to home, and country to country.

51. Defendants acted in a willful, wanton and reckless disregard for the safety of plaintiff's decedent, Vilma Soltesz.

52. This and the other misconduct by the defendants herein constituted outrageous, willful and/or wanton misconduct and manifested a reckless indifference to the rights of others, sufficient to support an award of punitive damages.

## VIII. COUNT III

### Wrongful Death

53. Plaintiff incorporates herein by reference all prior paragraphs of this Complaint as if fully set forth herein.

9

54. Vilma Soltesz is survived by her legal spouse, JANOS SOLTESZ.

55. By reason of the death of Vilma Soltesz, her beneficiary has in the past and will in the future continue to suffer great pecuniary loss, including, but not limited to, loss of support, loss of consortium, loss of aid, loss of services, loss of companionship and comfort, loss of counseling, and loss of guidance.

56. As a direct and proximate result of the foregoing, decedent's wrongful death beneficiary incurred or has been caused to incur and pay large and various expenses for medical treatment, hospital care and medicine rendered to decedent until the time of her death and to incur various funeral, burial and estate/administrative expenses for which plaintiff is entitled to compensation in this proceeding.

57. Neither the decedent nor anyone on her behalf have brought an action against defendants during her lifetime for the injuries and losses which she suffered by reason of the negligence, recklessness and other liability-producing acts of the defendants herein.

## IX. DEMAND FOR JURY TRIAL

58. Plaintiff demands a trial by jury for this action.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against defendants, jointly and severally, and each of them, as follows:

   a. on Count I for negligence, the sum of TWO MILLION ($2,000,000.00) DOLLARS;

   b. on Count II for gross negligence/outrageous conduct, the sum of TWO MILLION ($2,000,000.00) DOLLARS;

10

c. on Count III for wrongful death, the sum of TWO MILLION ($2,000,000.00)

DOLLARS;

and for such other relief that this Court deems just and proper.

Dated: Port Chester, New York
      January 23, 2013

**By: Holly Ostrov Ronai (HO 3923)**

**RONAI & RONAI, L.L.P.**
Attorneys for Plaintiffs
*The Ronai Building*
34 Adee Street
Port Chester, New York 10573
(914) 824-4777

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------

THE ESTATE OF VILMA SOLTESZ by administrator      Case No:
JANOS SOLTESZ, and JANOS SOLTESZ, individually,

                    Plaintiff,

      -against-


DELTA AIR LINES, INC., KONINKLIJKE
LUCHTVAART MAATSCHAPPIJ N.V. d/b/a
KLM ROYAL DUTCH AIRLINES and DEUTSCHE
LUFTHANSA AKTIENGESELLSCHAFT,

                    Defendants.

-------------------------------------------------------------------------

## COMPLAINT AND JURY DEMAND

-------------------------------------------------------------------------


**RONAI & RONAI, L.L.P.**
Attorneys for Plaintiff
*The Ronai Building*
34 Adee Street
Port Chester, New York 10573
914-824-4777